**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF GEORGIA**

**ATLANTA DIVISION**

| | |
|---|---|
| **IMPERATIVE LOGISTICS LLC,**<br><br>**and DTH Expeditors, LLC**<br><br><br>Plaintiffs,<br><br>v.<br><br><br>**ALABAMA MOTOR EXPRESS, LLC**<br>d/b/a AMX Expedited;<br>**JOSEPH COCHRAN;**<br>**MARY JONES,**<br><br><br>Defendants. | Civil Action No. ___________ |

**<u>VERIFIED COMPLAINT</u>**

Plaintiffs Imperative Logistics LLC ("Imperative" or the "Company") and DTH Expeditors, LLC bring this Verified Complaint against Defendants Alabama

Motor Express, LLC d/b/a AMX Expedited ("AMX"), Joseph Cochran ("Cochran"), Mary Evette Jones ("Jones") (Cochran and Jones, collectively, "Individual Defendants") (Individual Defendants and AMX collectively, the "Defendants") stating and alleging as follows:

## <u>NATURE OF ACTION</u>

1. This is an action seeking injunctive relief, compensatory and exemplary damages, attorneys' fees, and costs arising from Defendants' coordinated scheme to misappropriate Imperative's trade secrets and confidential information, breach restrictive covenant agreements, and tortiously interfere with Imperative's contractual relationships and business opportunities.

2. Each of the Individual Defendants was an employee of Imperative who had access to the Company's most sensitive trade secrets and confidential business information, including customer lists, pricing and rate structures and data, shipment data, standard operating procedures, and other confidential information related to the sales of Imperative products and services and Imperative's ability to compete for customers in the marketplace. Recognizing the critical information the Individual Defendants had, each Individual Defendant signed a Restrictive Covenant Agreement ("RCA") with the Company prohibiting, among other things, the misappropriation, theft, and

improper use and disclosure of trade secrets and confidential information, the solicitation of customers, and the solicitation of employees for specified periods following the termination of employment.

3. Between February and April 2026, both Individual Defendants resigned from Imperative and immediately began working for AMX, a direct competitor in the freight logistics and expedited freight forwarding industry. Their departures and subsequent conduct were part of and perpetuated a broader pattern in which five Imperative employees left in rapid succession to join AMX.

4. Defendants left evidence on their computers and electronic devices of their theft by intentional transfer of Imperative's trade secrets and confidential information. For example, Cochran forwarded proprietary Company data to his personal email account shortly before his departure, without any legitimate business need on behalf of Imperative to do so, with the intent to access and use that information on AMX's behalf after departing Imperative. Jones, as an AMX employee, accessed Imperative's confidential systems without authorization after her separation. Both then used the information to which they had access to solicit Imperative's customers on behalf of AMX, in direct violation of their RCAs.

5. AMX is responsible and liable for the misconduct. AMX, through its employees, including at least Cochran and Jones, improperly accessed and acquired Imperative's trade secrets and confidential information, including at least the information that Cochran and Jones exfiltrated from Imperative, and, upon information and belief, used. Upon information and belief, AMX facilitated, and benefited from this coordinated scheme with full knowledge of the Individual Defendants' contractual obligations to Imperative. Accordingly, Imperative brings this action to enforce its contractual rights, protect its trade secrets and confidential information, and recover damages caused by Defendants' unlawful conduct.

## PARTIES

6. Plaintiff Imperative Logistics LLC is a Delaware limited liability company with its principal place of business in Portland, Oregon. Imperative is engaged in the business of freight logistics and freight forwarding services, including expedited freight services.

7. DTH Expeditors, LLC (successor by conversion to DTH Expeditors, Inc., "DTH") is a Georgia limited liability company, with its principal place of business in Forest Park, Georgia. Trump Card Holdings, LLC, a wholly owned subsidiary of Imperative, acquired DTH in February 2025. As a result

of that acquisition, DTH is a wholly owned subsidiary of Trump Card Holdings, LLC, which is a wholly owned subsidiary of Imperative, and Imperative is the successor-in-interest to employment-related agreements entered into by DTH and each Individual Defendant.

8. Defendant AMX is a Georgia limited liability company with its principal place of business located in Ashford, Alabama. AMX maintains a registered agent in this District for service in Georgia. AMX is a direct competitor of Imperative in the freight logistics and expedited freight forwarding industry.

9. Defendant Cochran is an individual who, upon information and belief, is a citizen and resident of Georgia. Cochran was initially employed by DTH, and subsequently employed by Imperative (following its acquisition of DTH) as an Area Sales Representative from approximately October 3, 2005, until his voluntary resignation on or about March 30, 2026. Cochran is now employed by AMX.

10. Defendant Jones is an individual who, upon information and belief, is a citizen and resident of Georgia. Jones was initially employed by DTH, and subsequently employed by Imperative (following its acquisition of DTH) as Director of Operations from approximately October 1, 2000, until her voluntary resignation on or about February 10, 2026. Jones is now employed by AMX.

## JURISDICTION AND VENUE

11. This Court has original subject-matter jurisdiction over Imperative's claims under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1832 *et seq.* ("DTSA"), pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

12. This Court has supplemental jurisdiction over Imperative's state-law claims pursuant to 28 U.S.C. § 1367 because those claims arise from a common nucleus of operative fact as Imperative's federal DTSA claim and form part of the same case or controversy.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Georgia, including the Individual Defendants' employment with Imperative, the execution of the Restrictive Covenant Agreements, the misappropriation of trade secrets, and the solicitation of Imperative's customers. In addition, AMX maintains its Registered Agent in this District, and on information and belief, the Individual Defendants reside in this District.

14. This Court has personal jurisdiction over each Defendant. AMX maintains its Registered Agent in this District and conducts substantial business in Georgia. Each Individual Defendant resided and worked in Georgia during the relevant

period, executed their respective RCAs in Georgia, and engaged in the tortious conduct alleged herein in Georgia. The RCAs are governed by Georgia law.

## FACTUAL ALLEGATIONS

### *A. Imperative's Business*

15. Imperative is engaged in the business of freight logistics and freight forwarding, including expedited freight services. In this industry, pitches for, and in turn the ability to win, client work are often highly bespoke and depend on not only knowing how to support a client's specific needs, including how to provide particular services in a customized way for that client, such as particular shipment methods, timelines, or security or delivery requirements or preferences, but also on being able to know how to effectively and efficiently call on a broad network of trusted vendors to execute on these highly-customized delivery services on an expedited basis. The ability to win work at profitable rates depends heavily on internal pricing strategies, which are based on a deep understanding of the costs, logistics, and operating procedures necessary to carry out the particular services that clients need at particular times. This internal information is valuable to Imperative because it is carefully curated and confidential. By developing and utilizing its own internal pricing metrics and strategies, its own customer and vendor

information, and its own information on operating procedures, logistics, and other information related to the services provided to individual customers, Imperative is better positioned to provide high-quality service to clients on a timely basis, to win current and future work from those clients, and to price its services at rates that are both competitive and profitable for Imperative. For these reasons, the information that Defendants exfiltrated from Imperative is especially critical to Imperative's business and would not have been taken by departing employees or a competitor for any reason other than to use that bespoke internal information to solicit business.

16. Imperative has invested substantial time, effort, and resources over many years in developing and maintaining its confidential business information and trade secrets, including but not limited to: internal customer lists and data; internal bespoke pricing structures and rate information; individualized shipment data; sales codes; standard operating procedures developed for specific business operations; independent contractor information and driver rates; customer-specific logistics plans, quality policies, and weekly operational notes; cost and profit information and strategies; and other internal business information related to the sales, marketing, and execution of products and services.

17. Imperative takes reasonable measures to protect the secrecy of its trade secrets and confidential information. These measures include, without limitation, legal restrictions, including requiring employees with access to such information to sign Restrictive Covenant Agreements containing confidentiality and non-disclosure obligations and requiring employees to acknowledge the Company's Code of Conduct and Employee Handbook; physical barriers to prevent access to company sites, documents, and location; and technological measures restricting access to confidential systems, including password-protected access, encryption of certain data, access logging and monitoring, and other industry standard technological protection measures.

18. Examples of the type of information that Individual Defendants possessed or exfiltrated, that AMX improperly acquired, and that all Defendants, upon information and belief, used includes internal customer lists and data; internal bespoke pricing structures and rate information; individualized shipment data; sales codes; the company's processes for meeting client specific service preferences and requirements; standard operating procedures developed for specific business operations; independent contractor information and driver rates; customer-specific logistics plans, quality policies, and weekly operational notes; cost and profit information and strategies; and other internal

business information related to the sales, marketing, and execution of products and services.

19. Information that would impact Imperative's pricing, such as cost data, profit information, pricing structures and data, rate information, and previous prices agreed to with clients, constitutes valuable trade secret information. That pricing and financial information is often individualized for each customer and changes dynamically based on vendor availability, shipping rates, and market conditions. Especially in the expedited freight business, the ability to price and win work requires real-time pricing decisions based on internal data, as well as knowledge of Imperative's pricing model inputs and how Imperative establishes its margin profile.

20. Imperative's information relating to the services provided to customers—often including bespoke information and strategies relating to individual customers—including internal standard operating procedures ("SOPs") that Imperative develops, shipment data and sales codes, logistics plans, company plans and strategies for meeting client preferences on service, quality policies, and operational notes and information, constitute valuable trade secrets because the information is developed internally by Imperative on how Imperative can utilize its company capabilities, employees, vendors, and services to respond to bespoke customer needs. These SOPs and other

operational data have been developed over time to allow Imperative to respond quickly and effectively to customer needs. Expedited shipments often have unique handling requirements, specific service rules around pickup, delivery, storage, packing, delivery windows, security, or other considerations that depend heavily on understanding how to provide those services for particular customers in an efficient and timely manner. A competitor's knowledge of Imperative's information regarding services provided to customers would give a competitor a significant advantage in attempting to obtain business from customers. The competitor could position itself upfront as a purported expert or knowledgeable player in the industry with the ability to respond quickly and effectively to client demands without the need for the client to educate the competitor on what the client needs or for the competitor to spend substantial time assessing how it could utilize its own company resources to meet those client demands and requirements.

21. Imperative maintains internal information regarding customers and vendors, including information showing or including information for key decision-makers. Customers often have multiple divisions and various contacts, and it can take years to identify the actual decision-makers and then track that information in an organized way. Having this information, which goes beyond general business contact information that may be available publicly, is critical

to establishing and maintaining these customer relationships. Relatedly, Imperative has developed substantial information regarding vendors and service providers; knowing which vendors can provide specific services in a specific manner for a specific type of client is essential to responding quickly to client needs and, in turn, to the growth of the business.

### *B. The Individual Defendants' Employment and Access to Confidential Information*

22. The Individual Defendants were long-tenured employees of Imperative who held positions of trust and responsibility and were given access to the Company's most sensitive trade secrets and confidential business information in order to perform their job duties.

23. **Cochran** was employed as an Area Sales Representative from approximately October 3, 2005, through March 30, 2026. In that role, Cochran had direct access to customer accounts, as well as customer-specific pricing, margin profiles, shipment data, and contact information. Cochran's role gave him insight into how Imperative establishes its pricing and competes for customer business.

24. **Jones** was employed as Director of Operations from approximately October 1, 2000, through February 10, 2026. In that role, Jones had access to the

Company's confidential operational databases, standard operating procedures, rate sheets, quality policies, customer information for accounts, and vendor relationships. Jones's operational role gave her intimate knowledge of how Imperative services its customers' specific requirements and maintains its vendor network.

### *C. The Restrictive Covenant Agreements*

25. During their employment, each Individual Defendant executed a Restrictive Covenant Agreement ("RCA") with the Company (then known as DTH), each governed by Georgia law. Specifically:

26. Cochran executed his RCA on or about April 16, 2007. A true and correct copy is attached hereto as **Exhibit A**.

27. Jones executed her RCA on or about April 16, 2007. A true and correct copy is attached hereto as **Exhibit B**.

28. The RCAs include the following restrictive covenants:

**Section 2(b) "Non-Disclosure of Trade Secrets and Confidential Information:** Employee recognizes the interest of the Company in maintaining the confidential nature of its Trade Secrets and Confidential Information. Accordingly, Employee covenants and agrees that Employee will not, at any time, other than in the performance of Employee's duties for

the Company, both during and after Employee's employment with the Company, communicate or disclose to any person or entity, or use for Employee's benefit, or for the benefit of any other person or entity, including any Competing Business, either directly or indirectly, any of the Company's Trade Secrets and/or Confidential Information. For the purposes of this Agreement, the prohibition against the disclosure of Confidential Information only shall end twenty-four (24) months after the separation, for any reason, of Employee's employment with the Company. The disclosure of Trade Secrets by Employee is prohibited for the life of Employee, or until the Trade Secret information becomes publicly available through no direct or indirect fault or act of Employee."

**Section 2(c) "Handling of Company Property:** All property of the Company, including without limitation information and material containing Trade Secrets and Confidential Information, shall remain the exclusive property of the Company, and shall not be removed from the premises of the Company without the prior consent of the Company. If removed from the Company premises by consent, such information and material will be used only for the benefit of the Company in the ordinary course of business. All property of the Company, together with all copies thereof, shall be returned and delivered to the Company by Employee immediately without demand,

upon the termination of the Employee's employment with the Company for any reason, and shall be returned at any time if the Company so demands."

**Section 2(d) "Non-Solicitation of Customers:** Employee covenants and agrees that, during the term of Employee's employment with the Company and for a period of six (6) months following the separation of such employment, regardless of the reason for separation, Employee will not, either directly or indirectly, in competition with the Company Business, solicit, entice or recruit for a Competing Business, attempt to solicit, entice or recruit for a Competing Business, or attempt to divert or appropriate to a Competing Business, any actual or prospective customer of the Company with whom Employee had contact on behalf of the Company."

**Section 2(e) "Non-Solicitation of Employees:** Employee covenants and agrees that, during the term of Employee's employment with the Company and for a period of two (2) years following the separation of such employment, regardless of the reason for separation, Employee will not, either directly or indirectly, solicit, entice, encourage, cause, or recruit any person employed by the Company and with whom Employee had contact during Employee's employment with the Company to leave such person's employment with the Company to join a Competing Business."

29. The RCAs also include the following remedies provision: **Section 2(h) "Remedies:** Employee acknowledges and agrees that by virtue of the duties and responsibilities attendant to Employee's employment with the Company and Employee's access to Trade Secrets and Confidential Information, the Company will suffer irreparable loss and damage if Employee should breach or violate any of the covenants and agreements contained in this Section 2 of this Agreement. Employee therefore agrees and consents that, in addition to any other remedies available to the Company, the Company shall be entitled to a temporary restraining order, preliminary injunction and/or permanent injunction, without any bond or other security being required, to prevent a breach or contemplated breach by Employee and by any person or entity to whom Employee provides or proposes to provide any information or services in violation of any of the covenants or agreements contained in this Section 2 of this Agreement. Employee also shall be required to hold in a constructive trust, account for and pay over to the Company all compensation and other benefits derived by him and his subsequent employer(s), if any, as a result of any violation of Section 2 of this Agreement. Employee further agrees that, should the Company be forced to initiate legal proceedings to enforce any of its rights pursuant to this Agreement, Employee shall be required to pay the Company its reasonable costs of enforcement, including without limitation its

attorney's fees. Any rights created by this Agreement shall be in addition to, and not in lieu of, any other remedies that may exist under any applicable law or in equity."

30. Each Individual Defendant acknowledged in the RCA that the restrictive covenants are "(i) are fair and reasonable in that they are required for the protection of the legitimate business interests of the Company, including its customer relationships, goodwill, Trade Secrets and Confidential Information; (ii) are not greater than are necessary for the protection of the Company in light of the substantial harm that the Company will suffer should Employee breach any of the provisions of said covenants or agreements; (iii) form material consideration for this Agreement; and (iv) do not prohibit Employee from engaging in his business, trade or profession, or from becoming gainfully employed in such a way as to provide a standard of living for himself, the members of his family, and those dependent upon him, to which he and they have become accustomed and may expect." *See* Exhibit A ¶ 2(f), Exhibit B, ¶ 2(f).

31. The RCAs also stated that they "shall be binding and effective upon the Company and its successors and permitted assigns[.]" *See* Exhibit A ¶ 4, Exhibit B, ¶ 4.

32. As a result, the RCAs were effective between Cochran and Imperative following Imperative's acquisition of DTH.

33. The RCAs were also effective between Jones and Imperative following Imperative's acquisition of DTH.

### *D. Trade Secret Training and Acknowledgments*

34. In addition to executing their RCAs, each Individual Defendant acknowledged the Company's Employee Handbook and Code of Conduct.

35. Jones acknowledged the Handbook on February 18, 2025; Cochran acknowledged the Handbook on March 6, 2025.

36. The Handbook includes a section addressing "Confidentiality and Nondisclosure of Trade Secrets" which states: "As a condition of employment, Imperative Logistics Group employees are required to protect the confidentiality of Company trade secrets, proprietary information, and confidential commercially sensitive information (e.g., financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks, etc.) related to the Company. Access to this information should be limited to a 'need to know' basis and should not be used for personal benefit, disclosed, or released without prior authorization from management."

37. Both Individual Defendants were thus fully aware of their obligations to maintain the confidentiality of the Company's proprietary information and to refrain from using or disclosing such information following separation.

### *E. The Coordinated Departures to AMX*

38. Both Individual Defendants resigned from Imperative and immediately commenced employment with AMX, a direct competitor. The departures occurred in rapid succession:

39. Jones tendered her resignation on or about January 27, 2026, with her last day of employment on or about February 10, 2026. Cochran resigned on or about March 30, 2026.

40. The Individual Defendants' departures were part of a broader pattern in which five employees from the same Imperative office left in rapid succession to join AMX.

41. Upon information and belief, these departures were not coincidental but were part of a coordinated effort facilitated and encouraged by AMX to strip Imperative of key personnel and to gain access to Imperative's trade secrets, confidential information, and customer relationships. Upon information and belief, AMX contacted each Individual Defendant and all departing Imperative employees within a short period of time with the intent of

recruiting a large group of employees to join AMX, with the Individual Defendants assisting in attracting other employees to leave Imperative to join AMX.

### *F. Misappropriation of Trade Secrets and Breaches of the Restrictive Covenant Agreements*

42. **Cochran:** Shortly before his departure, Cochran forwarded to or blind copied his personal email account, and then continued to retain to allow ongoing access during his work with AMX, or otherwise obtained access to, various confidential internal emails and other documents relating to pricing, service and logistical methods, and profitability, including, for example, financial data on individual customers and portions of the company as a whole, margin and pricing information, documents relating to sales to and internal processes and requirements for bespoke service to Client A, sales to and internal processes and requirements for bespoke service to other customers, client list with sales codes, active shipments lists, specific service and financial information related to Imperative's work and individualized service for Client A, and a competitive bid—all of which constitute Trade Secrets and/or Confidential Information belonging to Imperative. Upon information and belief, AMX, through Cochran, has been using that information, as Cochran

had laid the groundwork to allow even before he departed Imperative when he sent confidential information to himself so he could have ongoing access to it.

43. Client A is a significant, long-standing Imperative customer account with which Cochran had direct contact during his employment. Imperative refers to Client A as Client A to protect the client's confidentiality, but the factual allegations relating to that client are specific to Client A.

44. Following his departure, Cochran has been actively pursuing and bidding against Imperative for the Client A account on behalf of AMX. As just one example, after Cochran joined AMX and even after cease-and-desist letters were sent by Imperative's counsel, Cochran organized a lunch meeting with Client A, as evidenced by Client A mistakenly sending a lunch invitation to Cochran's former Imperative email address rather than his AMX address. Upon information and belief, Cochran's employment at AMX has been the catalyst for encouraging Client A to bring business to AMX to Imperative's detriment. This conduct violates Section 2(b) (Non-Disclosure), Section 2(c) (Handling of Company Property), and Section 2(d) (Non-Solicitation of Customers) of his RCA.

45. As a result of Cochran's theft of Imperative's confidential and trade secret information, and his breach of his RCA, Imperative has experienced a decline

in revenue from Client A. Upon information and belief, Client A is now also doing business with AMX that Client A otherwise could have done with Imperative.

46. Upon information and belief, Cochran's and AMX's competing bids for the Client A account, informed by the client lists, shipment data, pricing information, and competitive bid information that Cochran misappropriated from Imperative, directly precipitated this decline.

47. **Jones:** After her separation on February 10, 2026, Jones accessed Imperative's confidential Google Drive databases and systems. For example, on April 9 and April 14, 2026—nearly two months after her employment termination—Jones intentionally accessed without authorization and viewed at least 36 confidential files, including standard operating procedures, rate sheets, quality objectives and policies, and Client A weekly operational notes. Jones did not request permission or inform Imperative of her access. The conduct was intentional: the database and the files within the database were not accessed merely passively, such as through an automated operation of the computer, but rather required a human login, clicks, and conduct to access and view the information.

48. Imperative's Google Drive databases and systems, including those to which Jones gained unauthorized access as alleged above, are cloud-hosted systems

that are accessed through, and operate by means of, the internet and other instrumentalities of interstate telecommunications infrastructure and interstate commerce and communication.

49. Imperative's Google Drive databases and systems support Imperative's freight logistics and freight forwarding business, which is inherently interstate in nature and involves the coordination of interstate shipments, customer accounts, pricing, and operational data across multiple states. Accordingly, the computer systems that Jones accessed without authorization are used in and affect interstate commerce and communication.

50. Among the documents and information that Jones accessed or exfiltrated from Imperative were confidential internal documents relating to pricing, service and logistical methods, and profitability, including, for example, documents relating to sales to and internal processes and requirements for bespoke service to Client A, sales to and internal processes and requirements for bespoke service to other customers, internal client lists that had been developed over time and with substantial effort, shipment lists and related information, pricing information and other financial data, standard operating procedures for multiple clients with internal information about service to clients, bid information—all of which constitute Trade Secrets and/or Confidential Information belonging to Imperative. Upon information and

belief, AMX, through Jones, has been using that information, as Jones not only was aware of the information while at Imperative but also took the information while an AMX employee, once that information could be used only to support AMX rather than Imperative.

51. Jones's unauthorized post-employment access to and, upon information and belief, use of Imperative's confidential systems and documents as described elsewhere in this complaint constitutes misappropriation of Trade Secrets and Confidential Information and violates Sections 2(b) and 2(c) of her RCA. In addition, upon information and belief, Jones has been soliciting Imperative's customers on behalf of AMX, in violation of Section 2(d) of her RCA.

### *G. AMX's Tortious Interference*

52. AMX is a direct competitor of Imperative in the freight logistics and expedited freight forwarding industry.

53. Upon information and belief, AMX has been aware during the period that each Individual Defendant breached the non-solicitation obligations in their Restrictive Covenant Agreements with Imperative, that the Individual Defendants were bound by those non-solicitation obligations. In the freight logistics and freight forwarding services industry, employees are commonly bound by contractual non-solicitation and confidentiality obligations,

especially for individuals whose job duties include assisting in sales. As a direct competitor of Imperative in the same industry, upon information and belief AMX knew or at least would have been on inquiry notice that the Individual Defendants had those contractual obligations. Further, on June 5, 2026, Imperative, through counsel, sent AMX cease-and-desist letters regarding five former Imperative employees, including each Individual Defendant, identifying the applicable contractual restrictions and demanding that AMX not engage in tortious interference with the employees' contractual obligations to Imperative. A true and correct copy of the cease-and-desist letter is attached hereto as **Exhibit C**[1]. Shortly after that, counsel for AMX responded, thereby acknowledging awareness of the contractual restrictions and the positions set forth in the cease-and-desist letters. Yet AMX offered no assurances that it would stop the misconduct. A true and correct copy of the response letter is attached hereto as **Exhibit D**.

54. Imperative, through counsel, also copied AMX on cease-and-desist letters to the individual departing employees, including each Individual Defendant, again making AMX aware of the contractual restrictions and the fact that certain solicitation violated those restrictions.

1__________________________

[1] Counsel has redacted Exhibit C's reference to the identity of Client A for confidentiality. Plaintiffs will file an unredacted version, if needed, under seal at the request of the Court or Defendants.

55. After having knowledge of the existence of contractual restrictive covenants, AMX worked with and has continued to work with both Individual Defendants to solicit Imperative's customers, including Client A and otherwise to breach their RCAs for AMX's competitive benefit. Upon information and belief, Defendants' solicitation of Imperative's customers has continued even after the June 5, 2026, letters. Indeed, less than a month after Cochran and AMX received demand letters from Imperative, Cochran, while an AMX employee, organized a meeting with an Imperative customer – a customer that Cochran was prohibited from soliciting for business on AMX's behalf and a customer for whom Cochran's prior work at Imperative would benefit AMX's ability to attempt to steal work.

56. As a direct and proximate result of AMX's tortious interference, Imperative has suffered and continues to suffer damages, including the loss of customer relationships, and the loss of revenue and profits.

### *H. Defendants' Conduct Irreparably Harms Imperative*

57. Imperative entered into the RCAs with Cochran and Jones to protect its legitimate business interests in its trade secrets and other valuable confidential information, its substantial relationships with prospective and existing customers, and its customer goodwill.

58. Imperative has a substantial interest in protecting and safeguarding Cochran's and Jones's knowledge of Imperative's confidential customer, pricing, and operational information, much of which they were privy to during their long tenures with the Company.

59. Imperative also has a substantial interest in protecting the existing and prospective customer relationships and goodwill that Cochran and Jones developed and maintained during their employment with Imperative.

60. Cochran's and Jones's breaches of their non-disclosure and non-solicitation obligations have irreparably harmed Imperative, and Imperative will continue to be irreparably harmed if its confidential information, customer relationships, and goodwill are not protected.

61. Imperative lacks an adequate remedy at law for Cochran's and Jones's breaches of their restrictive covenants.

62. Cochran and Jones both acknowledged in their respective RCAs that a breach of the restrictive covenants would cause Imperative irreparable loss and damage for which the Company would be entitled to injunctive relief. *See* Exhibit A ¶ 2(h); Exhibit B ¶ 2(h).

63. Cochran and Jones, on the other hand, will not suffer any undue burden from enforcement of their agreements. Compliance with the RCAs does not preclude Cochran and Jones from working altogether, but only from

disclosing or using Imperative's confidential information, soliciting Imperative's customers and employees, and competing with Imperative within the narrow scope of their respective covenants.

64. Cochran and Jones also agreed that Imperative shall have the right and remedy to enjoin them, preliminarily and permanently and without the necessity of posting a bond, from violating or threatening to violate their restrictive covenants. *See* Exhibit A ¶ 2(h); Exhibit B ¶ 2(h).

65. Accordingly, the only sufficient protection for Imperative is an injunction against Cochran's and Jones's continuing and future breaches that requires them to comply with their non-disclosure and non-solicitation obligations under the RCAs.

***I. Enforcing the Restrictive Covenants Serves the Public Interest***

66. Enforcing the restrictive covenants to which Cochran and Jones agreed would serve the public interest as expressed by the Georgia General Assembly, which has affirmed the value of such covenants in protecting legitimate business interests and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state. O.C.G.A. § 13-8-50.

67. Georgia's public interest is served by enforcing valid agreements governed by Georgia law and executed in Georgia by Cochran and Jones, both Georgia residents, in connection with their employment with Imperative.

68. The Georgia public and Imperative both have a significant interest in the enforcement of the restrictive covenants in the RCAs, which are reasonable and comply with the Georgia Restrictive Covenants Act. These interests are not outweighed by any interest that Cochran or Jones has in breaching plainly enforceable contract provisions to which they agreed.

69. In sum, all equitable factors weigh in favor of issuing preliminary and permanent injunctive relief to enforce Cochran's and Jones's non-disclosure and non-solicitation obligations.

70. Pursuant to Section 2(h) of the RCA, Cochran and Jones are also contractually obligated to pay Imperative's reasonable attorneys' fees and costs incurred in enforcing their obligations.

71. Imperative performed all of its obligations under the RCA, and all conditions precedent to the filing of this action have been performed, waived, or otherwise satisfied.

# COUNT ONE

## MISAPPROPRIATION OF TRADE SECRETS

**(Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.)**

*(Against All Individual Defendants)*

72. Imperative incorporates by reference paragraphs 1 through 71 above as if fully set forth herein.

73. Imperative owns trade secrets as defined by 18 U.S.C. § 1839(3), including but not limited to customer lists, pricing and rate information, shipment data, customer-specific logistics plans, standard operating procedures, independent contractor information and driver rates, and other proprietary business information (collectively, the "Trade Secrets").

74. Imperative derived independent economic value from the Trade Secrets not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from their disclosure or use.

75. The Trade Secrets are not readily ascertainable through proper means. For example, Imperative's customer lists include not only customer names but also internal sales codes, contact information for key decision-makers, pricing history, service preferences, and relationship data that could not be obtained through public sources or industry directories. Imperative's pricing

information reflects proprietary margin calculations, vendor cost structures, and customer-specific rate negotiations that are not publicly available and could not be reverse-engineered from market data. Imperative's standard operating procedures and customer-specific logistics plans reflect years of internal development and customer-specific customization that could not be independently developed without substantial time and expense.

76. Imperative took reasonable measures to keep the Trade Secrets secret, including restricting access to authorized personnel, requiring employees to sign RCAs with confidentiality obligations, and maintaining electronic access controls.

77. The Trade Secrets are related to products and services used in, and intended for use in, interstate commerce.

78. Defendants Cochran and Jones misappropriated Imperative's Trade Secrets within the meaning of 18 U.S.C. § 1839(5) by acquiring, disclosing, and/or using the Trade Secrets without Imperative's consent and by improper means. For example, Cochran forwarded to his personal email account client lists with sales codes, active shipment data, three months of Client A shipment/pickup data, and a competitive bid, and used this information to solicit Imperative customers for AMX. Jones accessed Imperative's confidential systems after her separation, viewing 36 files containing standard

operating procedures, rate sheets, quality objectives, and customer operational notes, including information related to Client A, and used this information to solicit Imperative's customers for AMX.

79. As a direct and proximate result of these Defendants' misappropriation of Imperative's Trade Secrets, Imperative has suffered and will continue to suffer damages, including lost profits and the diminution in value of its trade secrets, in an amount to be proven at trial.

80. The misappropriation by Defendants Cochran and Jones was willful and malicious, entitling Imperative to exemplary damages in an amount not more than two times the damages awarded, pursuant to 18 U.S.C. § 1836(b)(3)(C).

81. Imperative is entitled to recover its reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

## **COUNT TWO**

## MISAPPROPRIATION OF TRADE SECRETS

**(Georgia Trade Secrets Act, O.C.G.A. § 10-1-760 et seq.)**

*(Against All Individual Defendants)*

82. Imperative incorporates by reference paragraphs 1 through 81 above as if fully set forth herein.

83. Imperative owns trade secrets as defined by O.C.G.A. § 10-1-761(4), including but not limited to customer lists, pricing and rate information, shipment data, customer-specific logistics plans, standard operating procedures, independent contractor information and driver rates, and other proprietary business information.

84. Imperative derived independent economic value, actual or potential, from its Trade Secrets not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from their disclosure or use.

85. Imperative was the subject of efforts that were reasonable under the circumstances to maintain the secrecy of its Trade Secrets.

86. Each Individual Defendant misappropriated Imperative's Trade Secrets within the meaning of O.C.G.A. § 10-1-761(2) by acquiring, disclosing, and/or using the Trade Secrets without Imperative's express or implied consent and through improper means, as set forth in detail above.

87. As a direct and proximate result of the Individual Defendants' misappropriation, Imperative has suffered and will continue to suffer damages in an amount to be proven at trial.

88. The misappropriation was willful and malicious, entitling Imperative to exemplary damages not exceeding twice the damages otherwise recoverable, pursuant to O.C.G.A. § 10-1-763.

89. Imperative is entitled to recover its reasonable attorneys' fees pursuant to O.C.G.A. § 10-1-764.

## COUNT THREE

## BREACH OF CONTRACT—RESTRICTIVE COVENANT AGREEMENT

*(Against Defendant Cochran)*

90. Imperative incorporates by reference paragraphs 1 through 89 above as if fully set forth herein.

91. Cochran entered into a valid and enforceable RCA with Imperative on or about April 16, 2007 (Exhibit A), which contains restrictive covenants including confidentiality, return-of-property, customer non-solicitation, and employee non-solicitation obligations.

92. Imperative performed all obligations required of it under the RCA, including employing Cochran through his voluntary resignation on March 30, 2026.

93. Cochran has breached the RCA by, among other things: (a) forwarding Imperative's confidential client lists, shipment data, and competitive bid information to his personal email account in violation of Sections 2(b) and

2(c); and (b) actively soliciting and pursuing Imperative customers, including at least Client A, on behalf of AMX within six months of his March 30, 2026 separation, in violation of Section 2(d).

94. As a direct and proximate result of Cochran's breach, Imperative has suffered and will continue to suffer damages in an amount to be proven at trial.

95. Pursuant to Section 2(h) of the RCA and O.C.G.A. § 13-6-11, Imperative is entitled to recover its reasonable attorneys' fees and costs incurred in enforcing Cochran's obligations under the RCA.

## COUNT FOUR

## BREACH OF CONTRACT—RESTRICTIVE COVENANT AGREEMENT

*(Against Defendant Jones)*

96. Imperative incorporates by reference paragraphs 1 through 95 above as if fully set forth herein.

97. Jones entered into a valid and enforceable RCA with Imperative on or about April 16, 2007 (Exhibit B), which contains restrictive covenants including confidentiality, return-of-property, customer non-solicitation, and employee non-solicitation obligations.

98. Imperative performed all obligations required of it under the RCA, including employing Jones through her voluntary resignation on February 10, 2026.

99. Jones has breached the RCA by, among other things: (a) accessing Imperative's confidential systems and viewing 36 confidential files after her separation, in violation of Sections 2(b) and 2(c); and (b) soliciting Imperative's customers on behalf of AMX within six months of her February 10, 2026, separation, in violation of Section 2(d).

100. As a direct and proximate result of Jones's breach, Imperative has suffered and will continue to suffer damages, including loss of competitive advantage, costs of investigating and remediating Jones's unauthorized access, and lost business opportunities, in an amount to be proven at trial.

101. Pursuant to Section 2(h) of the RCA and O.C.G.A. § 13-6-11, Imperative is entitled to recover its reasonable attorneys' fees and costs incurred in enforcing Jones's obligations under the RCA.

## COUNT FIVE

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

*(Against Defendant AMX)*

102. Imperative incorporates by reference paragraphs 1 through 101 above as if fully set forth herein.

103. Valid and enforceable contracts existed between Imperative and each Individual Defendant in the form of the RCAs (Exhibits A–B), which impose

upon each Individual Defendant binding obligations of confidentiality, non-solicitation of customers, non-solicitation of employees, and return of Company property.

104. AMX had knowledge of the existence of the RCAs and the Individual Defendants' contractual obligations to Imperative, both through industry knowledge of standard practice of contractual restrictions, as well as directly through cease-and-desist letters sent from Imperative's counsel to AMX. Despite receiving these letters, AMX has continued to employ the Individual Defendants and, upon information and belief, has continued to facilitate and benefit from their breaches of the RCAs, including solicitation of customers and employees.

105. AMX intentionally and improperly induced, facilitated, and/or encouraged the Individual Defendants to breach their RCAs by, among other things, hiring both Individual Defendants, whose separations from the same Imperative office occurred within approximately six weeks of one another, to support an overarching scheme and plan to, among other things, solicit customers from Imperative, despite knowledge at the time that the Individual Defendants had restrictive covenants; directing, inducing, authorizing, encouraging, or ratifying the Individual Defendants to solicit Imperative's customers without authorization; and knowingly benefiting from the Individual Defendants'

unauthorized solicitation, and therefore upon information and belief rewarding the employees for the benefit to encourage and induce them to continue the misconduct. Upon information and belief, AMX directed and benefited from the Individual Defendants working on the same or similar customer accounts that they had serviced while employed by Imperative. Upon information and belief, after receiving demand letters from Imperative's counsel expressly raising concerns about the Individual Defendants' ongoing solicitation of Imperative's customers, AMX management failed to take adequate steps to prevent the Individual Defendants from continuing such solicitation. As evidenced by the fact that the solicitation of Imperative's customers by the Individual Defendants on behalf of AMX continues to the present date, AMX has ratified and acquiesced in the Individual Defendants' continued breaches of their contractual obligations to Imperative.

106. AMX's interference with the RCAs is not protected by any privilege or other justification. AMX exceeded the scope of any applicable privilege or justification by, among other things, knowingly inducing employees to breach valid restrictive covenants, including after having actual knowledge of the Individual Defendants' valid and enforceable contractual obligations to Imperative, as evidenced not only by market conditions and understanding but also more directly by the cease-and-desist letters sent by Imperative's counsel

on June 5, 2026, as well as AMX's counsel's acknowledgment of such letters. Despite this knowledge, AMX continued to employ the Individual Defendants in roles that involved solicitation of Imperative's customers and failed to take any steps to ensure that the Individual Defendants complied with their contractual obligations to Imperative.

107. Upon information and belief, a substantial purpose in hiring the Individual Defendants and facilitating their breaches of the RCAs was not simply to advance AMX's legitimate business interests through lawful competition, but rather to injure a key competitor, Imperative, by stripping it of multiple key personnel and diverting its established customer relationships. This conduct exceeded the bounds of legitimate competition and is not protected by any privilege.

108. AMX's conduct further exceeded the bounds of legitimate competition because, upon information and belief, AMX intentionally engaged in a targeted and coordinated effort to raid Imperative's workforce. Rather than hire one or even two employees, AMX hired five employees from the same Imperative office in rapid succession. Upon information and belief, this pattern was not coincidental but was the result of AMX's deliberate campaign to strip Imperative of key personnel with the ability to solicit relationships that they had built at Imperative.

109. Upon information and belief, AMX acted purposely and with malice, and with the intent to injure Imperative, by knowingly facilitating, encouraging, and benefiting from the Individual Defendants' breaches of their RCAs for AMX's own competitive advantage.

110. As a direct and proximate result of AMX's tortious interference, Imperative has suffered and will continue to suffer damages, including loss of customer relationships, loss of revenue and profits, loss of talent and employees, and the loss of exclusive use of its information, in an amount to be proven at trial.

111. Imperative is entitled to recover its reasonable attorneys' fees pursuant to O.C.G.A. § 13-6-11 based on AMX's bad faith, stubborn litigiousness, and/or causing Imperative unnecessary trouble and expense.

## COUNT SIX

## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030(a)(2)(C))

*(Against Defendant Jones)*

112. Imperative incorporates by reference paragraphs 1 through 111 above as if fully set forth herein.

113. Imperative's Google Drive databases and systems, as described above, are protected computers within the meaning of 18 U.S.C. § 1030(a)(2)(C) because they are used in and affect interstate commerce and communication.

114. Jones's employment with Imperative terminated on February 10, 2026, after which time Jones had no authorization to access Imperative's computer systems, including its Google Drive databases.

115. Notwithstanding the termination of her employment and the extinguishment of her access rights, Jones intentionally accessed Imperative's Google Drive databases and systems on April 9 and April 14, 2026, using her former Company login credentials.

116. Jones's access to Imperative's protected computers on April 9 and April 14, 2026, was without authorization because at the time of such access, Jones held no continuing authorization of any kind—express or implied—to access Imperative's systems after Jones had left Imperative. To the contrary, Jones agreed and acknowledged that she had permission to access and use company information only for the company's benefit.

117. By means of this unauthorized access, Jones intentionally obtained information from Imperative's protected computers, including by accessing and viewing at least 36 confidential files comprising Imperative's standard operating procedures, rate sheets, quality objectives and policies, and Client A weekly operational notes.

118. Jones's unauthorized access to, and acquisition of information from, Imperative's protected computers was committed in furtherance of, and to

facilitate, Jones's misappropriation of Imperative's Trade Secrets and Confidential Information in violation of the DTSA, 18 U.S.C. § 1836 et seq., the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760 et seq., and Jones's breach of Sections 2(b) and 2(c) of her Restrictive Covenant Agreement.

119. As a direct and proximate result of Jones's violation of 18 U.S.C. § 1030(a)(2)(C), Imperative has suffered, and continues to suffer loss including the reasonable costs of conducting an investigation, including a forensic analysis and damage assessment, to determine the scope and extent of Jones's unauthorized access, the costs of revoking Jones's access credentials and securing Imperative's systems against further unauthorized access, the costs of assessing the confidentiality and integrity of the files Jones accessed without authorization, which losses aggregate at least $5,000 in value within a one-year period. Imperative is entitled to recover compensatory damages and injunctive and other equitable relief against Jones.

**COUNT SEVEN**

**ATTORNEYS' FEES UNDER O.C.G.A. § 13-6-11**

(*Against All Defendants*)

120. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

121. Defendants have caused Plaintiffs unnecessary trouble and expense in their attempt to recover the amounts due them. As such, Plaintiffs are entitled to recovery of attorneys' fees pursuant to O.C.G.A. §13-6-11 and other applicable law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

- A temporary restraining order and/or preliminary injunction, and ultimately a permanent injunction, enjoining each Defendant from:

  a. Disclosing, using, or exploiting any of Imperative's Trade Secrets or Confidential Information;

  b. Soliciting, contacting, or doing business with any customer of Imperative in violation of any Individual Defendant's or other former Imperative employee's respective RCAs;

  c. Recruiting or soliciting any employee of Imperative in violation of any Individual Defendant's or other former Imperative employee's respective RCAs;

d. Retaining or using any of Imperative's property, documents, or materials; and

e. Directing, inducing, encouraging, or facilitating any of the above.

- An Order requiring each Defendant to immediately return all of Imperative's property, documents, and materials in their possession, custody, or control, and to delete or destroy all copies of Imperative's Trade Secrets and Confidential Information;
- Compensatory damages in an amount to be proven at trial, including lost profits and any unjust enrichment of Defendants;
- An order requiring Cochran and Jones to disgorge, and hold in constructive trust for Imperative's benefit, all compensation and other benefits derived by them and by AMX as a result of their breaches of the RCAs, pursuant to Section 2(h) of the RCAs;
- Exemplary damages not exceeding two times the compensatory damages awarded pursuant to 18 U.S.C. § 1836(b)(3)(C) and O.C.G.A. § 10-1-763;
- Reasonable attorneys' fees and expenses of litigation as may be awarded, including at least fees and expenses pursuant to 18 U.S.C. § 1836(b)(3)(D), O.C.G.A. § 10-1-764, O.C.G.A. § 13-6-11, and/or the RCAs;
- Costs of this action;

- Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all issues so triable.

Respectfully submitted this 31st day of August, 2026.

*/s/ David A. Bain*
David A. Bain
Georgia Bar No. 032449
Law Offices of David A. Bain, LLC
1230 Peachtree St., N.E.
Suite 1050
Atlanta, GA 30309
Tel: 404.724.9990
Fax: 404.724.9986
Email: dbain@bain-law.com

John H. Gray
*Pro Hac Vice* forthcoming
Ashurst Perkins Coie US LLP
2525 E. Camelback Rd., Ste. 500
Phoenix, AZ 85016
Tel: 602.351.8092
Fax: 602.648.7000
Email:
John.Gray@ashurstperkins.com

Heather L. Shook
*Pro Hac Vice* forthcoming
Ashurst Perkins Coie US LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Tel: 206.359.8000
Fax: 206.359.9000
Email:
Heather.Shook@ashurstperkins.com

*Counsel for Plaintiffs Imperative Logistics, Inc. and DTH Expeditors, LLC*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and 14-point font.

Dated: August 31, 2026

*/s/ David A. Bain*

David A. Bain
Georgia Bar No. 032449
Law Offices of David A. Bain, LLC
1230 Peachtree Street, NE
Suite 1050
Atlanta, GA 30309
Telephone: (404) 724-9990
Facsimile: (404) 724-9986
dbain@bain-law.com

Counsel for Plaintiffs

**VERIFICATION**

I, Kristi McFarland, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that:

1. I am Chief People and Marketing Officer of Imperative Logistics Group LLC and I am authorized to make this verification on behalf of Plaintiffs.

2. I have reviewed the foregoing Verified Complaint and the facts stated therein are true and correct to the best of my knowledge, information, and belief.

3. I make this declaration based on my personal knowledge, and/or upon review of business records and documents maintained by Plaintiffs in the ordinary course of business.

Executed on August 31, 2026, in Portland, Oregon.

______________________________________

Kristi McFarland

Chief People and Marketing Officer of Imperative Logistics Group LLC